**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

IN ADMIRALTY

CASE NO: 20-cv-62438-GAYLES/STRAUSS

NOBLE HOUSE, LLC,

    Plaintiff,

v.

DERECKTOR FLORIDA, INC.,

    Defendant.
_____/

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**

1. Plaintiff's vessel ("the Vessel") entered Defendant's shipyard on October 3rd, 2016 and departed on December 4, 2017. [ECF No. 85], p. 5, ¶ 47.

2. Plaintiff paid Defendant $3,475,755.26 for works performed on the Vessel pursuant to a contract between the parties. [ECF No. 85], p. 5, ¶ 48.

3. Plaintiff's liability expert (Mark Robinson) discovered a time-stamped photograph dated September 19, 2016 (*i.e.* prior to entering Defendant's shipyard), showing the proper locking mechanism on the Vessel's rudder, *and equally important,* it did not show the use of a flat metal bar as a locking mechanism on the Vessel's rudders. [ECF No. 85], p. 5, ¶ 49.

4. Plaintiff's liability expert (Mark Robinson) discovered a drawing by the American Bureau of Shipping which describes the approved methodology for locking the Vessel's rudders. [ECF No. 85], p. 6, ¶ 50.

5. On August 20, 2018, Captain Joseph Collins issued a MAYDAY call over VHF radio to seek emergency assistance as the Vessel had begun to take on water after losing its port-side rudder while under normal operation at sea. [ECF No. 85], p. 6, ¶ 51.

6. During the salvage process the salvor noted that "the rudder stock nut on the starboard rudder *does not appear to be tightened down all the way*". [ECF No. 85], p. 6, ¶ 52. (salvage report by company that rescued the Vessel) (emphasis added). The salvors further noted that "David Mitchell [(one of the salvors)] then tightens down the bolt on the *locking tab* at the top of the rudder stock nut." *Id*. (emphasis added).

7. The Vessel's port-side rudder detached while the Vessel was at sea and began to take on water rapidly through her port rudder opening. [ECF No. 85], p. 6, ¶ 53.

8. The starboard-side rudder (which was identical to the port-side rudder) survived, and Plaintiff's liability expert (Mark Robinson) discovered that a flat metal bar had been installed as a rudder-locking mechanism. Mr. Robinson opined that this modification, which could only have been made by Defendant, was improper and was not approved by Plaintiff or any of the regulatory bodies responsible approving such changes. [ECF No. 85], p. 6, ¶ 54.

9. Defendant's employee, Joel Ramos, <u>admitted</u> that he personally installed the flat metal bar on both port and starboard rudders. [ECF No. 85], p. 6, ¶ 55. (Q: Did you personally install the flat metal bar?" (A: Yes. Did you install it on both port side and starboard side rudders? A: both sides").

10. Defendant's employee, Joel Ramos, <u>admitted</u> that he was provided blueprints that described the approved and proper mechanism and manner to attach the Vessel's rudders – and that these blueprints <u>did not</u> include the use of a flat metal bar as a locking

mechanism. [ECF No. 85], p. 7, ¶ 56. (Joel Ramos Deposition) ("Q: Are you speaking about blueprints that describe how to attach the rudder to the vessel? A: Yes. Q: And are you telling me that these blueprints provided instructions on how to attach the rudder to the vessel? A: Yes. Q: Did these blueprints include the use of a flat metal bar you described earlier? A: No").

11. Defendant employee, Joel Ramos, <u>admitted</u> that he installed the flat metal bar as a locking mechanism and further <u>admitted</u> that the Vessel's rudders would **never** drop out if the locking mechanism was properly installed. [ECF No. 85], p. 7, ¶ 57. (Joel Ramos Deposition) ("Are you telling me that the purpose of the flat metal bar is to stop the rudder from falling down, should the rudder begin to slip out? A" Yes it could. **On my personal opinion, it will never happen if the locking mechanism is in there**") (emphasis added).

12. And yet, the Vessel's port-side rudder detached while out at sea. [ECF No. 85], p. 7, ¶ 58. (salvage report by company that rescued the Vessel).

13. Defendant employee, Joel Ramos, <u>admitted</u> that the flat metal bar which he installed as a locking mechanism *was not present* on the Vessel when the Vessel first arrived at Defendant's shipyard. [ECF No. 85], p. 7, ¶ 59. (Q: "was the flat metal bar there when the vessel first arrived at Derecktor? A: No").

14. Defendant employee, Joel Ramos, <u>admitted</u> that he attempted to tighten the hex nut that secures the Vessel's rudders but was unable to do so. In response, he requested Defendant's welding department manufacture a specialty wrench to help him tighten the hex nut which was in a very difficult to reach space. [ECF No. 85], p. 7, ¶ 60. (Joel Ramos Deposition).

15. Defendant employee, Joel Ramos, also <u>admitted</u> that the manner in which he used the home-made specialty wrench consisted of latching the specialty tool onto the hex nut which secures the Vessel's rudders and then hitting the tool with a hammer to try to fully tighten the nut.  [ECF No. 85], p. 8, ¶ 61 (Joel Ramos Deposition).

16. Defendant employee, Scott Sabety, <u>admitted</u> that whoever tightened the hex nut must have been "very uncomfortable" because the area is a "very tight confined space" that is hard to get into.  [ECF No. 85], p. 8, ¶ 62 (Scott Sabety Deposition) (A: "He would have been very uncomfortable for sure. Q: Why is that? A: the just very tight confined space. Q: Okay. A: You know. Q: Is it hard to get into this space because its sort of a tight compartment? A: It is").

17. Defendant's employee, Joel Ramos, further <u>admitted</u> that he has no idea how the Vessel's port-side rudder detached while out at sea.  [ECF No. 85], p. 8, ¶ 63

18. Defendant employee, Joel Ramos, also <u>admitted</u> that he never witnessed an American Bureau of Shipping ("ABS") employee inspecting the rudder locking mechanism.  [ECF No. 85], p. 8, ¶ 64.

19. Defendant's own marine surveyor expert, Frank Van Delft, <u>admitted</u> that he conducted a joint survey of the Vessel with another surveyor (Mr. Revel Boulon) and that Mr. Revel Boulon's expert opinion was that Defendant "could have been responsible for the – losing the rudder".  [ECF No. 85], p. 8, ¶ 65 (Frank Van Delft Deposition).

20. Defendant's own marine surveyor expert, Frank Van Delft, <u>admitted</u> that Mr. Revel Boulon (a non-party marine surveyor) explained that "the actual stock nut, which is the big nut which holds the rudder in place, **that that nut had not been sufficiently tightened** over

the available threads of the stock…**Derecktor had not tightened the nut down sufficiently**". [ECF No. 85], p. 8, ¶ 66 (Frank Van Delft Deposition) (emphasis added).

21. Defendant employee, Joel Ramos, <u>admitted</u> that the hex nut could have been tightened "a little more, but not much more". [ECF No. 85], p. 9, ¶ 67 (Joel Ramos Deposition).

22. The addition of the flat metal bar was not a proper or approved substitute for fully and properly tightening and securing the hex nut in the manner required by the blueprints provided to Defendant; and clearly, the addition of the metal bar was ineffective in preventing the improperly affixed nuts from backing out to allow the rudder to fall away. *Id.*

23. Defendant's own marine surveyor expert, Frank Van Delft, <u>admitted</u> that he refrained from passing along the information he uncovered from Mr. Revel Boulon to Defendant's other disclosed expert, Rik Van Hemmen. [ECF No. 85], p. 9, ¶ 68.

24. Plaintiff's liability expert, Mark Robinson, discovered the rudder locking mechanism solution crafted by Bradford Marine – the shipyard the Vessel was towed towards once it was salvaged. [ECF No. 85], p. 9, ¶ 69.

25. Plaintiff specifically requested the amount of damages Defendant claimed Plaintiff was contractually limited to collect by interrogatory, but Defendant <u>failed</u> to provide an exact figure. [ECF No. 85], p. 9, ¶ 70

26. Defendant <u>admitted</u> that it <u>did not</u> receive "approval from the American Bureau of Shipping ("ABS") for alterations, modifications, or deviations to the rudder locking mechanism". [ECF No. 85], p. 9, ¶ 71 (Defendant Answers to Second Interrogatories).

27. Plaintiff is entitled to damages as outlined in its answers to Defendant's interrogatories. [ECF No. 85], p. 9, ¶ 72.

28. Defendant employee, Joel Ramos, <u>admitted</u> that he never consulted a naval architect to determine how to assemble or disassemble the Vessel's rudders. [ECF No. 85], p. 10, ¶ 73.

29. Defendant expert witness, Rik Van Hemmen, <u>admitted</u> that the flat metal bar installed by Joel Ramos was an "ineffective securing for the rudder nut". **Exhibit 28**, p. 97 ln 16. He further <u>admitted</u> that the surviving port-side rudder securing mechanism was "insufficient and the rudder fell out". [ECF No. 85], p. 10, ¶ 74.

30. The clause in the parties agreement [ECF No. 18-1] is unenforceable because it would result in an award of only nominal damages which fail to deter negligence. [ECF No. 18-1], p. 9, ¶ 5.

## **PLAINTIFF PROPOSED FINDING OF LAW**

1. "To show breach of contract under Florida law, a plaintiff "must prove (1) a valid contract); (2) a material breach, and (3) damages". *Dagnesses v. Target Media Partners*, 711 F. App'x 927, 933 (11th Cir. 2017).

2. In the Eleventh Circuit, district courts apply a three-part test to determine whether a limitation of liability clause is enforceable in a maritime contract. *Mount Sage, Ltd. V. Rolls-Royce Commer. Marine Inc.*, 635 F.App'x 833, 836 (11th Cir. 2016) (citing *Diesel "Repower", Inc., v. Islander Invs. Ltd.,* 271 F.3d 1318, 1324 (11th Cir. 2001)). Limitation of liability clauses are valid if they meet three criteria: "(1) clearly and unequivocally indicate the parties' intentions; (2) not absolve the repairer of all liability and still provide a deterrent to negligence; and (3) the "businessmen" must have equal bargaining power so there is not overreaching." *Id.* at 836-37 (citation omitted) (emphasis added).

3. "Claims for breach of warranty of workmanlike performance sound in contract". *Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's London*, 766 F. App'x 795, 801 (11th Cir. 2019).

4. Invoices for cost of repairs are accurate statement of damages suffered by Plaintiff. *Kol B'Seder, Inc. v. Certain Underwriters at Lloyd's of London*, 766 F. App'x 795, 804 (11th Cir. 2019).

5. "The warranty of workmanlike performance is an implied warranty that is imposed on a maritime service contractor and requires services to be performed with reasonable care, skill and safety." *Delta November, LLC v. Baker*, No. 10-10086-CIV, 2011 U.S. Dist. LEXIS 116000, 2011 WL 4501118, at *3 (S.D. Fla. Aug. 23, 2011) (citing *Vierling v. Celebrity Cruises, Inc.*, 339 F.3d 1309, 1315 (11th Cir. 2003)). The warranty of workmanlike performance, which was established in *Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp.*, 350 U.S. 124, 76 S. Ct. 232, 100 L. Ed. 133 (1956), "is a product of the admiralty courts and a creature of admiralty law." *Centraal Stikstof Verkoopkanter, N.V. v. Walsh Stevedoring Co.*, 380 F.2d 523, 529 (5th Cir. 1967). "As an admiralty law theory, this implied warranty applies only to admiralty contracts, specifically admiralty service contracts." *Fed. Ins. Co. v. Mathews Bros., LLC*, Civil Action No. RDB-14-3794, 2015 U.S. Dist. LEXIS 107049, 2015 WL 4879194, at *7 (D. Md. Aug. 14, 2015); *see also Centraal Stikstof*, 380 F.2d at 529 ("Those cases in which the doctrine has been applied have been admiralty cases which presented substantially similar circumstances to those existing in *Ryan*.") (citations omitted). *All Underwriters Subscribing to Policy of Ins. No. B0621mmilsyb15055 v. Rika Boats Ltd.*, No. 16-20498-

CIV-LENARD/GOODMAN, 2017 U.S. Dist. LEXIS 107873, at *6 (S.D. Fla. July 11, 2017).

6. Admiralty law recognizes an implied warranty of workmanlike service [*5] which arises from contractual relationships. *Tai-Pan, Inc. v. Keith Marine, Inc.*, 1997 AMC 2447, 2453 (M.D. Fla. 1997); *Little Beaver Enter. v. Humphreys Rys, Inc.*, 719 F.2d 75, 77-78 (4th Cir. 1983); *Coffman v. Hawkins & Hawkins Drilling Co., Inc.*, 594 F.2d 152, 154 (5th Cir. 1979) ("independent shore-based contractors that go aboard a vessel 'by the owner's arrangement or by his consent to perform service for the ship's benefit impliedly warrant to the shipowner that they will accomplish their task in a workmanlike manner. The essence of the contractor's warranty of workmanlike performance is to perform its work 'properly and safely.'"). Because this is an automatic term inserted into every admiralty service contract it makes no difference that the contract does not explicitly mention this duty of care. Id; *Little Beaver Enter.*, 719 F.2d at 78 ("This warranty need not be express to bind the ship repairer to use the degree of diligence, attention and skill adequate to complete the task."); *Union Marine & General Ins. Co. v. Am. Export Lines*, 274 F. Supp. 123, 128 (S.D.N.Y. 1966) ("contracts of work and labor contain an implied warranty that the work will be done in skilled and workmanlike manner, and the fact that the agreement is oral is immaterial."). The warranty of workmanlike performance is a duty to perform the work "properly and safely," Coffman, 594 F.2d at 154, and with a "'degree of diligence, attention and skill adequate to complete the task.'" *Muller Boat Works, Inc. v. Unnamed 52' House Barge*, 464 F. Supp. 2d 127, 146 (S.D.N.Y. 2006) (quoting Coffman, 594 F.2d. 154). The implied warranty of workmanlike performance applies [*6] to purely economic

property loses. *Tai-Pan, 1997 AMC at 2453*; *Taylor v. Carey's Diesel*, No. 07-80106-CIV-DIMITROULEAS, 2007 U.S. Dist. LEXIS 112946, at *4-6 (S.D. Fla. May 24, 2007).

7. Plaintiff's tort-based claim of negligence were dismissed, but in any case this claim is subsumed within its breach of the implied warranty claim. *Diesel "Repower," Inc.*, 271 F.3d at 1326 (citing E. River *Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 871, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986)); *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 766 (5th Cir. 1989) ("Whether the negligence alleged is in the performance of a contract for services, or in a contract for the sale of goods, the resulting economic loss is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law." (quotation omitted)); *Travelers Ins. Co. v. Commercial Cool-Temp Corp.*, No. 11-61748-CIV-DIMITROULEAS/S, 2012 U.S. Dist. LEXIS 201547, at *16 (S.D. Fla. Sep. 26, 2012).

8. A contract to repair a vessel is maritime in nature. *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1352 (S.D. Fla. 2007), aff'd, 308 Fed. Appx. 389 (11th Cir. 2009). The elements of a maritime breach-of-contract claim under admiralty law and Florida law are the same: "(1) a valid contract; (2) a material breach; and (3) damages." *Seacor Marine LLC v. FPC Sea Striker*, 2015 U.S. Dist. LEXIS 4452, at *4 (M.D. Fla. Jan. 13, 2015) (citations omitted). A valid contract requires offer and acceptance and a meeting of the minds as to the terms of the agreement. *Roberts & Schaefer Co. v. Hardaway Co.*, 152 F.3d 1283, 1290 (11th Cir. 1998). "To constitute a vital or material breach, a party's nonperformance must 'go to the essence of the contract'." *MDS (Can.), Inc. v. RAD Source Techs., Inc.,* 720 F.3d 833, 849 (11th Cir. 2013) (*quoting in part Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So. 2d 853, 857 (Fla. Dist. Ct. App. 1972)).

Based upon the foregoing, the Court concludes that Plaintiff has meet its burden of proving its claims for Breach of Contract and Breach of the Warranty of Workmanlike Performance. The Court also concludes that the clause limiting damages in the parties' agreement is unenforceable and that Plaintiff is entitled to recover all of its damages proximately caused by Defendant.

WHEREFORE, this Court rules as follows:

1. On Plaintiff's Count for Breach of Contract and the Count for Breach of the Warranty of Workmanlike Performance, the Court rules in favor of Plaintiff, Noble House, LLC and against Derecktor Florida, Inc.

2. Plaintiff established a material breach of the Dockage and Yard Agreement by Derecktor Florida.

3. Plaintiff established a breach of duty by Derecktor Florida in its reinstallation of the Noble House rudders and therefore, Defendant breached the warranty of workmanlike performance.

4. As a further and additional finding, the Court also finds that the Plaintiff has met its burden of proving damages on both its Breach of Contract and Breach of the Warranty of Workmanlike Performance Claims through repair invoices and expert testimony.

5. Based on the Court's findings of fact and conclusions of law above, the Court will

enter final judgment in favor of Plaintiff, Noble House, LLC and against Defendant Derecktor Florida, Inc.

DONE and ORDERED in Chambers, at Miami-Dade County, Florida on this _____ day of October, 2022.

Dated: October 28, 2022

Respectfully submitted,

**MOORE & COMPANY, P.A.**
*Counsel for Plaintiff*
255 Aragon Avenue, Third Floor
Coral Gables, Florida 33134
Telephone: (786) 221-0600
Facsimile: (786) 221-0601
cnaughton@moore-and-co.com
michael@moore-and-co.com

s/ Clay Naughton
Clay Naughton, Esq.
Florida Bar No. 29302

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. Copies of this pleading will be automatically served on all counsel of record through the Court's CM/ECF system.

s/ Clay Naughton